# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND (NORTHERN DIVISION)

| | | |
|---|---|---|
| TECH USA, INC. and TECH USA, LLC, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Civil Action No.:_____ |
| | ) | |
| JASON R. BECK and CONTENDER | ) | |
| SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COME the Plaintiffs TECH USA, INC. and TECH USA, LLC (collectively "TECH USA" or "Plaintiff") by and through their attorneys Allan P. Hillman of Kern & Hillman, LLC and Grover C. Outland, III, General Counsel, TECH USA, and sues Defendants Jason R. Beck ("Mr. Beck") and Contender Solutions, LLC ("CSL") (Mr. Beck and CSL being collectively referred to hereinafter as "Defendants" and, singly, as "Defendant").  TECH USA sues Defendant Mr. Beck for breach of contract (post-term covenant not to solicit, perform services for, or provide staffing to, TECH USA clients), breach of contract (confidential information), and statutory trade secret misappropriation; and sues Defendant CSL for tortious interference with the contract between Plaintiff TECH USA, INC. and statutory trade secret misappropriation.

As described below, there are now three actions pending between the TECH USA entities and Mr. Beck.   He filed an action in this Court in late September 2012, and the TECH USA entities moved to dismiss it, as his claims are subject to the mandatory arbitration clause of

his Employment Agreement; then the TECH USA entities filed an arbitration against Mr. Beck

based upon claims for his breaches while employed by them, all of which are subject to the same

mandatory arbitration clause.  Finally, the TECH USA entities filed this suit, alleging claims for

violations of his <u>post</u>-employment obligations, which are expressly excluded from the arbitration

clause and are properly before this Court.

## THE PARTIES,
## JURISDICTION AND VENUE

### TECH USA

1.      Plaintiff TECH USA, INC. is a Maryland corporation with its principal place of

business at 8334 Veterans Highway, Millersville, MD 21108.   TECH USA, INC. owns 95% of

the membership interests of its affiliate Plaintiff TECH USA, LLC, which since January 1, 2009

has been the operating entity for the TECH USA business.

2.      TECH USA is a mid-size competitor in the nationwide and worldwide market for

providing customized staffing, consulting, and solutions to commercial and government

customers.  In TECH USA's industry ("Staffing Industry"), the terms "staffing", "consulting"

and "solutions" are synonymous.  Plaintiff started its business in a single 1,000 square foot office

in Millersville, Maryland in early 1998, and has, in the past twelve years, grown to 13 offices in

10 states.  TECH USA has expertise particularly in the areas of engineering, information

technology, infrastructure/telecommunications, aerospace and government services, and

scientific and professional services.  Its competitors in the Staffing Industry include companies

ranging from those with revenues of many hundreds of millions of dollars (or more) to small

start-ups, such as Defendant CSL.  TECH USA develops close working relationships with its

corporate and non-corporate customers in order better to understand and service their personnel and hiring needs, and, furthermore, extensively trains and develops close working relationships with its internal and external (contract) employees in order more completely and professionally to meet TECH USA's customers' personnel requirements and hiring needs.

## DEFENDANT MR. BECK

3.      Defendant Mr. Beck is an individual and a citizen of Florida.  He carries on a regular business, is employed, or habitually engages in a vocation in Tampa.  Mr. Beck resides at 11810 Glen Wessex Court, Tampa, FL 33626.

## DEFENDANT CSL

4.      Defendant Contender Solutions, LLC is a limited liability company formed under the laws of the State of Florida on September 7, 2012.  Defendant CSL carries on a regular business and maintains an office at 6309 Fjord Way, New Port Richey, FL 34652.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under all Counts of this Complaint pursuant to 28 U.S.C. §1332, because the parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Jurisdiction and venue are proper in this judicial district because Defendant Mr. Beck expressly agreed in Section 13(i), on page 20 of his May 25, 2005 Employment Agreement ("Employment Agreement") with Plaintiff TECH USA, INC. that Defendant Mr. Beck:

> "hereby consent[s], in any action brought in connection with any matters described in Section(s) 9, 10(a), 10(b), and/or 10(c) of this

> Agreement, to the jurisdiction of any federal or state court within the State of Maryland, and [he] waive[s] all questions, issues, and defenses as to personal jurisdiction and venue for the purpose of carrying out this provision."

(True and correct copies of excerpts relied on here from the Employment Agreement are collected in **Exhibit A** hereto.)  Further, the Employment Agreement breached by Mr. Beck and interfered with by CSL was executed in Maryland.  This action (in particular Counts I and II) is based on, and brought in connection with Defendant Mr. Beck's breaches of Restrictive Covenants in Section 10(b) [Non-Solicitation of Clients – Count I] and Section 9 [Confidentiality – Count II].  (Exhibit A, supra.)  Venue is proper pursuant to 28 U.S.C. 1391, as well as MD. CODE ANN., CTS. & JUD. PROC., § 6-202(3) and (11).  Furthermore, venue is proper in this judicial district because, as quoted above, Defendant Mr. Beck agreed in the 7th sentence of Section 13(i) of the Employment Agreement that he "waive[s] all questions, issues, and defenses as to personal jurisdiction and venue for the purpose of carrying out this provision."

## THE CONTROVERSY

7.     Pursuant to the terms of the aforementioned Employment Agreement between Plaintiff and Mr. Beck, he became the corporate President, a "senior executive and a trusted leader" of Plaintiff TECH USA, INC., in which capacity he worked for TECH USA, INC. and then for its affiliate TECH USA, LLC for just over seven years until June 11, 2012, on which date he resigned from TECH USA's employment.  Subsequent to his resignation, Defendant Mr. Beck has contended that he was fired.  That debate is not relevant to the outcome of this action.

8.     As set forth below, the Employment Agreement protects TECH USA's trade secrets and Confidential Information (collectively "Confidential Information") and also requires Mr. Beck to refrain from, among other things, (a) competing with TECH USA during the term of his TECH USA employment, (b) soliciting TECH USA's employees and/or encouraging the

departure of any of TECH USA's employees during the period of his employment and for twelve (12) months thereafter, and/or (c) soliciting TECH USA's clients/customers during the period of his employment and for twelve (12) months thereafter.

9.      Plaintiff has recently learned that, at some point after resigning from TECH USA, Defendant Mr. Beck became a member of and/or began managing, working for, consulting with, or otherwise rendering services to a limited liability company ("LLC") known as Contender Solutions, LLC ("CSL"), which the Florida Department of State (Division of Corporations) records (attached hereto as **Exhibit B**) indicate was formed on September 7, 2012, approximately three months after Mr. Beck's resignation from TECH USA.   A Dun and Bradstreet ("D&B") DNBi Risk Management report (attached hereto as **Exhibit C**) indicates in the lower left hand corner of its page 1 that the "Manager" of CSL is "JASON BECK, MEMBER" and, in the lower third of page 4 of that 5-page DNBi Risk Management report that the report was made as a result of a "SELF REQUEST. This record was originally created on September 12, 2012, at the request of Jason Beck, Member."   Furthermore, in Defendant Mr. Beck's own LinkedIn profile, over which he has sole control (attached hereto as **Exhibit D**), he represents himself as "CEO Contender Solutions" and also features his previous association with Plaintiff in that on-line, public profile.   On information and belief, Defendant Mr. Beck's owns seventy-five percent (75%) of the membership interests of Defendant Contender Solutions, LLC, and a Mr. Gallagher owns the remaining 25% of the membership interests of Defendant CSL.

10.     On September 28, 2012, Defendant Mr. Beck filed an action (Civil Action No. 1: 12-cv-02897-CCB) in this Court ("Beck's Complaint"), as plaintiff, seeking (i) declaratory judgment that a Letter Agreement entered into with TECH USA (after the Employment Agreement) is rescinded and null and void because Mr. Beck's execution of that Letter

Agreement was allegedly "involuntary, made under duress, and coerced, lacked consideration, and [TECH USA, INC./TECH USA, LLC] have materially breached" that Letter Agreement (*see* §32 of that Complaint), (ii) alleging breach of contract and seeking monetary damages from TECH USA, INC. and TECH USA, LLC, and (iii) asserting a breach of fiduciary duty by the CEO of TECH USA, INC. and TECH USA, LLC and Plaintiff's founder and majority shareholder Thomas B. Howell, Sr. ("Mr. Howell") and seeking monetary damages from him.

11.     Section 13(i), on page 20 of the Employment Agreement is in pertinent part an arbitration clause between the "Employer" Plaintiff TECH USA, INC. and the "Employee" Defendant Mr. Beck, reciting as follows:

> Excepting only legal actions for matters described in Section(s) 9, 10 (a), 10 (b), and/or 10 (c) above and any workers compensation, unemployment, and ERISA/benefits matters, <u>any and all grievances, disputes, controversies, causes of action, and any and all other claims of any nature whatsoever, whether arising in contract, under statute, in tort, or otherwise between Employee and Employer</u> (collectively "Claims") must first be addressed and fully negotiated by Employer and Employee in a face-to-face meeting in Maryland, and then, if that meeting does not resolve any and all Claims that the Parties' have, any unresolved Claims shall be submitted to mediation to occur in Maryland pursuant to the then-prevailing American Arbitration Association Employment Dispute Resolution Rules (the "AAA Rules")…All arbitration demands shall be filed with the American Arbitration Association's ("AAA's") Atlanta, GA regional office and all arbitration proceedings shall take place in the Baltimore, MD metropolitan area.  Judgment upon the award of the arbitrator(s) may be entered in the court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the award or any order of enforcement.  This Agreement shall take effect upon its acceptance, execution and receipt by Employer in Maryland.  This Agreement and relationship of the parties (and any and all Claims between Employee and Employer, whether sounding in contract, statute, tort, or otherwise, arising out or in any way in connection with this Agreement or such relationship) shall be governed by, construed and enforced in accordance with the local/internal laws of the State of Maryland, without regard to conflict of laws principles…Employee hereby consents, in any action brought in

connection with any matters described in Section(s) 9, 10(a), 10(b), and/or 10(c) of this Agreement, to the jurisdiction of any federal or state court within the State of Maryland, and Employee waives all questions, issues, and defenses as to personal jurisdiction and venue for the purpose of carrying out this provision…Employer and Employee agree that the prevailing party (whether Employer or Employee) shall have the right to recover its reasonable attorneys fees and other costs and expenses incurred in connection with the arbitration and any pre- or post-arbitration motions and procedures….

(*See* Exhibit A; emphasis in the original.)  The claims and Counts in this Complaint constitute legal actions for matters described in three of the four of Employment Agreement Sections [9, 10(a), and 10(b)] that are expressly "carved out" of the parties' agreement on arbitration by the "Excepting only" clause in the first two lines of Section 13(i) above.  Consequently, Plaintiff's claims against Defendant Mr. Beck in this action are non-arbitrable and properly before this Court.  Not only is Employer TECH USA entitled to recover, if it prevails, "its reasonable attorneys' fees and other costs and expenses incurred in connection with…any pre- or post-arbitration motions and procedures" (as set forth in the final sentence quoted from Section 13(i) above), but of direct relevance here, Employment Agreement Section 13(m) provides: "Attorney's Fees. In the event of any litigation arising out of this Agreement, the "Prevailing Party" shall be entitled to court costs and reasonable attorney's fees at the arbitration, trial and at the appellate levels."

12.     On October 24, 2012, pursuant to the above arbitration clause contained in Employment Agreement §13(i), TECH USA, INC. and TECH USA, LLC (as Claimants) filed with the American Arbitration Association their arbitrable claims against Mr. Beck (as Respondent) for breaches of contract, breaches of fiduciary duty, and declaratory judgment, relating to his duties while employed and up to and including termination of employment,

seeking arbitration and mediation there of those arbitrable claims against Mr. Beck.   That arbitration filing is not relevant to the adjudication of the instant Motion of Defendants in this action, as this Complaint is a "legal action(s) for matters described in Section(s) 9, 10(a), 10(b), and/or 10(c)" of the Employment Agreement, dealing with post-employment obligations, and expressly carved out by that clause from the parties' agreement on arbitration.

13.     On October 25, 2012, TECH USA, INC., TECH USA, LLC, and Mr. Howell filed their Motion to Dismiss in this Court under Fed.R.Civ.P. 12(b)(1), or Alternatively to Stay Pending Arbitration/Mediation pursuant to 9 U.S.C. § 3 as to all of Mr. Beck's claims, that he, as Plaintiff, had brought in Beck's Complaint.  None of Mr. Beck's claims in that action are found in any of the above-quoted arbitration clause's carve-outs: (i) declaratory judgment seeking rescission and/or invalidation of a Letter Agreement; (ii) allegations of breach of contract by TECH USA, INC. and TECH USA, LLC, and (iii) claim of breach of fiduciary duty by Mr. Howell.

14.     At some point in late September or early October 2012, without disclosing Defendant Mr. Beck's ownership or involvement, Defendant CSL approached Plaintiff TECH USA's TDC Government Solutions division regarding a relationship that CSL had solicited or developed (or was developing), with a large TECH USA customer headquartered on the West Coast of the U.S. ("Beck's Solicited TECH USA Customer") and requested that TECH USA make available to Beck's Solicited TECH USA Customer, through CSL as an intermediate level subcontractor (part of the prime contractor – subcontractor – sub subcontractor structure from Beck's Solicited TECH USA Customer to CSL to Plaintiff) contract employee Allen J. Yeung. He specializes in network/IT storage engineering.  Newly-formed CSL, with whom TECH USA had not previously done business, made its approach through a former TECH USA customer

manager named Mr. Gallagher ("Mr. Gallagher"), with whom TECH USA had done business over a number of years, primarily in supporting the TECH USA Customer that became Beck's Solicited TECH USA Customer a few months after the termination of Beck's employment with TECH USA.

15.     Unbeknownst to Plaintiff at the time CSL approached it through Mr. Gallagher, Defendant Jason Beck was, on information and belief, the actual manager and/or member of Defendant CSL.   On information and belief, Defendant CSL and/or Defendant Beck also approached, called on and/or solicited the West Coast based customer of Plaintiff that became Beck's Solicited TECH USA Customer and arranged with that Customer for Defendant CSL to assign six (6) to nine (9) engineers and/or other technical personnel providing on-site professional services to Beck's Solicited TECH USA Customer while employed by Defendant CSL.   On information and belief, Defendant Mr. Beck likely failed to disclose to Mr. Gallagher or falsely denied to him that Defendant Mr. Beck was bound by certain post-term covenants/restrictions in favor of Plaintiff pursuant to Employment Agreement paragraph 10(b), among other provisions. It provides as follows:

### SECTION 10. RESTRICTIVE COVENANTS

Employee, as a senior executive and trusted leader of Employer and TEAM TECH USA consisting of Employer's other employees, consultants, and contractors, will not only have access to Employer's Confidential Information (as defined above), but will also have complete access to, and the trust of, Employer's other employees and clients.  Accordingly, in order reasonably to protect Employer's interests, Employee covenants as follows:

….

**(b) Non-Solicitation of Clients.**

During the period of Employee's employment with Employer, ***and for a period of one year after the date of any Employment***

> ***Termination, the Employee agrees that he will not, directly or
> indirectly, for the Employee's benefit or for the benefit of (or on
> behalf of) any*** person, corporation, partnership, ***LLC,*** or any other
> entity whatsoever: *call on; solicit; perform services for; provide
> contract, consulting or personnel staffing services for;* interfere
> with Employer's relationship with; and/or endeavor to entice away
> from Employer ***(i) any customer or client of Employer to whom
> Employer provides, or has provided, services or personnel at any
> time during the twelve (12) month period preceding the date of
> Employment Termination***; and/or (ii) any prospective customer or
> client to whom Employer made a presentation or solicitation at any
> time during the 12 month period preceding Employment
> Termination.

(*See* Exhibit A; emphasis added.)

16.     By (i) assigning Plaintiff TECH USA's contract employee Mr. Yeung to Beck's

Solicited TECH USA Customer, through a new relationship (or contract) that Defendant CSL

had apparently developed (or obtained) with Beck's Solicited TECH USA Customer, and/or (ii)

providing that TECH USA Customer with six (6) to nine (9) engineers and/or other technical

personnel performing on-site services as employees of Defendant CSL for that TECH USA

Customer, Defendant Beck has "directly or indirectly, for [his] benefit or for the benefit (or on

behalf of) any … LLC [i.e. CSL], or any other entity whatsoever: call[ed] on; solicit[ed];

perform[ed] services for; provide[d] contract, consulting or personnel staffing services for…any

customer or employee of [TECH USA to whom TECH USA] provides or has provided services

or personnel at any time during the twelve (12) month period preceding the date of the

Employment Termination…", thereby violating the above-quoted restrictive covenant in Section

10(b).  Beck's Solicited TECH USA Customer has been a customer of TECH USA to which

TECH USA has, as set forth above in Section 10(b)(i), "provided services or personnel at any

time within the twelve (12) month period" preceding June 11, 2012, the date that Defendant Mr.

Beck's employment with TECH USA terminated.

17.     As detailed below, Defendant Mr. Beck's conduct in (i) "call[ing] on, solicit[ing], perform[ing] services for [and/or providing] contract, consulting or personnel staffing services for" and/or (ii) assigning engineering and other technical employees or consultants of his company Defendant CSL to any TECH USA customer including but not limited to Beck's Solicited TECH USA Customer, whether directly or indirectly through Defendant CSL, also violated Employment Agreement Section 9, which provides as follows:

> Employee acknowledges that, in and a result of Employee's employment hereunder, ***Employee will be making use of,*** *acquiring and/or adding* **Confidential Information developed by Employer and of a special and unique nature and value to Employer, including but not limited to, the nature and material terms of business opportunities and proposals available to Employer, Employer's methods, system and research, the names and addresses of its clients and staffing personnel, prices charged and paid** by Employer or its clients, technical memoranda, research reports, employment specifications, report cards, client records and files, staffing personnel records and files, services, operating procedures, charts, ledgers, accounts receivable ledgers, methods and systems, accounting payable ledgers, records of amounts received from clients, financial records of the Employer and of clients, any and all insurance records of Employer, and other information, data and documents now existing, or later acquired by Employer/Employee, regardless of whether any such information, data, or documents qualify as a 'trade secret' under applicable Federal or State law (collectively, Confidential Information").     As a material inducement to Employer to enter into this Agreement and to pay to employee the compensation and benefits referred to in Section 4 hereof, ***Employee covenants and agrees that Employer shall not at any time during the employment term or following any termination thereof, directly or indirectly, divulge or disclose for use for any purpose whatsoever (except for the sole and exclusive benefit of Employer), and Confidential Information which has been obtained by or disclosed to Employee as a result of Employee's employment with Employer***.   In accordance with the foregoing, the Employee further agrees that Employee will at no time retain or remove from the premises of the Employer records of any kind or description whatsoever for any purpose whatsoever unless authorized by Employer, and will return all of the foregoing to

Employer upon Employer's request or any termination of Employee's employment…

The obligations of Employee under this Section 9 shall survive any termination of this Agreement.   During employment term, Employee shall exercise all sure and diligent precautions to protect the integrity of the business plans, customer and client lists, statistical data and compilation, agreements, contracts, manuals or other documents of Employer which embody the Confidential Information, and upon the expiration and the termination of the Employment Term, Employee agrees that all Confidential Information in his possession, directly or indirectly, that is in writing or other tangible form (together with all duplicates thereof) will forthwith be returned to Employer and will not be retained by Employee or furnished to any person, either by sample, facsimile, film audio or video cassette, electronic data, verbal communication or any other means of communication.   The Employee agrees that the provisions of this Section 9 are reasonably necessary to protect the proprietary rights of Employer in the Confidential Information and its trade secrets, goodwill and reputation.

(*See* Exhibit A; emphasis added.)

18.     Thus, Defendant Mr. Beck, while he was corporate President of Plaintiff, worked in the Tampa office from time-to-time, and, by virtue of his presence there, he became familiar with the account that became Beck's Solicited TECH USA Customer and Mr. Gallagher, to reiterate, a hiring manager for a subcontractor through which Plaintiff had placed many personnel over a number of years on assignment to Beck's Solicited TECH USA Customer's projects at various locations.   In reaching out to Mr. Gallagher for his "Contender Solutions, LLC" venture (Defendant Mr. Beck's yacht is named "Contender"), and hijacking or seeking to hijack TECH USA's relationship with Beck's Solicited TECH USA Customer, Mr. Beck was violating Section 9 of his Employment Agreement in that he was "making use of…Confidential Information developed by [TECH USA] of a special and unique nature and value to [TECH USA], including, but not limited to, the nature and material terms of business opportunities and proposals available to [TECH USA, TECH USA's] methods, system and research, the names and

address of its clients and staffing personnel, prices charged and paid…" (See Exhibit A, quoted above.)

19.     Furthermore, by his contacts through Defendant CSL, and hiring/assigning the TECH USA contract employee Allen Yeung and six (6) to nine (9) other engineers and/or technical personnel to Beck's Solicited TECH USA Customer, Defendant Mr. Beck breached the following provision in Employment Agreement Section 9 on Confidentiality: "*Employee covenants and agrees that Employer shall not at any time…following any termination thereof, directly or indirectly, divulge or disclose for use for any purpose whatsoever…Confidential Information which has been obtained by or disclosed to Employee as a result of Employee's employment with Employer.*"  Defendant Mr. Beck necessarily divulged or disclosed at a minimum to Defendant CSL Confidential Information regarding (i) the customer relationship between TECH USA and Beck's Solicited TECH USA Customer, (ii) the contract employee(s) working for TECH USA on assignment to Beck's Solicited TECH USA Customer, and (iii)_that TECH USA Customer's staffing/personnel needs and requirements (including prices charged and paid), as well as the nature and material terms of business opportunities at that TECH USA Customer.  All of the above disclosures are breaches of the Confidentiality provisions contained in Section 9 of the Employment Agreement. The sole exception, where the disclosure in question in "for the sole exclusive benefit of Employer" TECH USA, does not apply here.   On the contrary, Defendant Mr. Beck's disclosures of Confidential Information, as described above, benefitted Defendant Mr. Beck and his newly-formed limited liability company, the Defendant Contender Solutions, LLC.

20.     Plaintiff's Chief Executive Officer, majority shareholder and founder Mr. Howell

risked a substantial part of his life savings in the start-up of TECH USA and knows from decades of personal experience that obtaining a customer and then holding onto that customer in today's highly competitive marketplace is a very difficult, time-consuming and investment-intensive process, especially in the staffing industry in which Plaintiff TECH USA competes.

21.     From each of its offices, TECH USA expends a large amount of money, time, and other resources on its salespeople, sales management team, executives, and recruiters, training them to research their respective territories and vertical fields to find and acquire customers and develop customer relationships.  Plaintiff also makes major investments in national sales training conferences which all, or almost all, of TECH USA's executive management team, managing directors, account executives, and/or recruiters attend.   For even a well-trained salesperson, obtaining a new customer can take anywhere from six (6) to twenty-four (24) months from initial "cold call" or introduction/referral, to obtaining various meetings, to placing the first contract employee on assignment there with the customer (or providing a new employee for direct placement with the customer). The 12-month duration of the Client Non-Solicitation covenant and the Employee Non-Solicitation covenant in Defendant Mr. Beck's Employment Agreement with TECH USA reflects that lengthy sales cycle and also the fact that, after a sales executive (like Mr. Beck), managing director, salesperson or recruiter leaves TECH USA's employment, there needs to be a reasonable period (12-24 months) in which that former employee refrains from soliciting Plaintiff's customers and employees.  This hiatus allows for the orientation and training of a replacement (or new sales team or adjustment of sales teams) and for the orderly transition of TECH USA customers and customer accounts serviced by or contacted by the former employee during his employment.  In the case of Mr. Beck, while President of Plaintiff, he had sales management responsibilities across TECH USA and very detailed information at his

fingertips on every TECH USA customer/account and every employee (internal and external), such as the contract employee that his new company, Defendant CSL has assigned to Beck's Solicited TECH USA Customer.  While a 12-month restriction is the timeframe that some of Plaintiff's competitors have in their non-compete agreements with their employees, others choose an 18-month or lengthier period, which is also reasonable in the industry.

22.     In training its staffing salespeople and recruiters (and their managing directors and executive management team), and facilitating job performance by all, TECH USA provides them with Confidential Information and Trade Secrets that TECH USA has developed over its 14-year history, affording each of those employees and officers access to specific data on existing customers and prospective customers, including but not limited to non-public contact information for those customers' hiring managers, as well as methods, techniques, and tools to price Plaintiff's services and expand its business/servicing footprint within the customer's organization, in order to grow TECH USA's offerings/services from finding personnel for one business unit or department (e.g. IT) within a customer to several units or departments with the customer's organization (e.g. Engineering, Infrastructure-Telecommunications, etc.). Confidential Information and Trade Secrets that TECH USA employees, from the newest recruiter to the highest ranking corporate officer, receive in order to perform their jobs include corporate and other customer and hiring manager names and contact information, and highly valuable, competitive information, notably pricing margins used in past transactions with customers, and customer preferences on preferred staffing solutions -- whether they utilize contract assignments, direct/permanent placements, "temp to perm" (otherwise known as "right to hire") arrangements, or other staffing solutions -- in securing new hires or personnel for new projects.

15

23.     All of the Confidential Information and Trade Secrets described in the preceding paragraph constitutes information that Plaintiff TECH USA has developed over many years with substantial effort and experience; Plaintiff has safeguarded that Confidential Information and those Trade Secrets -- it was not and has not been public information, nor was it (or has it been) readily available to Plaintiff's competitors.   In fact, the Confidential Information and Trade Secrets would be very valuable to TECH USA's competitors, and it would take them substantial time and expense to ascertain it.   While an element or two of the above Confidential Information and Trade Secrets may be ascertainable outside of TECH USA's business (such as the customer's corporate name and a switchboard or other listed phone number), it is the combination of all of the elements, especially hiring manager contact information, including hiring managers' and other contact persons' email addresses and direct dial phone numbers, and most importantly, <u>standing alone</u>, the customer pricing margins, and customer preferences on preferred staffing solutions, together with the identity, skillsets, salary levels, and contact information of the TECH USA employees providing those solutions, that proves extremely valuable, indeed indispensable to TECH USA's (and to any competitor's) business.   That information as a whole, and in numerous parts, is not known outside of Plaintiff's business, would be very difficult and expensive, and time-consuming for competitors to ascertain by legal means.

24.     Only those employees of Plaintiff involved in recruiting, sales, sales management, and executive leadership know the above Confidential Information and Trade Secrets, and TECH USA safeguards it by taking such measures as (i) requiring that recruiting, sales, sales management, and executive leadership employees of Plaintiff who need access to Confidential Information and Trade Secrets (in order to service TECH USA customers and accounts) sign

Plaintiff's form Confidentiality/Non-Competition Agreement, or, in Defendant Mr. Beck's case the Employment Agreement, which (among other things) explicitly protects those Trade Secrets and Confidential Information and/or requires the return of all TECH USA Company Property at termination of employment, (ii) not providing the above Confidential Information and Trade Secrets to third parties outside of TECH USA, and (iii) not posting Plaintiff's customer names or other customer information (or Plaintiff employee names or other Plaintiff employee information) on the TECH USA website; rather, the TECH USA Confidential Information and Trade Secrets are provided only to those executive, management, sales and recruiting employees (who comprise a small percentage of Plaintiff's total employee roster) having a "need to know." Access to the current TECH USA database that came into use in 2006 is via unique user name and password only, both of which are inactivated when an employee leaves the company.  The above Confidential Information and Trade Secrets are extremely valuable to TECH USA and its competitors because, armed with that Information and those Secrets, a competing staffing firm or former employee of Plaintiff could initiate a business relationship with Customers of TECH USA and steal business from Plaintiff, just as Defendant Beck has done (as detailed above).

25.     In order to develop and enhance the Confidential Information and Trade Secrets, Plaintiff expends many years and months of effort and large sums of money, e.g. salaries of TECH USA executive leaders, managing directors, account executives, and recruiters on training, sales development efforts, territory reviews, cold-calling/prospecting, time and expenditures on meetings with customer representatives, and the like. Properly acquiring or duplicating the above Confidential Information and Trade Secrets, as a whole, would be very difficult to accomplish because such Information and/or Secrets are not located in one publicly accessible database.  It has been developed over many months and years of numerous cold calls

and meetings, and includes, as well, Plaintiff's detailed experience in actual transactions with the customer(s) in order to determine pricing margins and customer preferences on staffing solutions provided.

26.    Members of TECH USA's executive management team and its managing directors (who are also in sales) and outside salespersons (known as "Account Executives" or "Business Development Managers"), as well as Plaintiff's inside salespersons (beginning with entry-level "Recruiters" having promotion opportunity to "Senior Recruiters"), each sign their own employment agreements with Plaintiff in order to protect Plaintiff's interests in its business relationships with TECH USA customers and contract employees (or candidates) that Plaintiff assigns/refers to its customers, and also to protect Plaintiff's Confidential Information and Trade Secrets that are made available to TECH USA employees in order for them successfully to secure and service customers.  Despite the extended sales cycle needed to secure certain large corporate customers (up to 24 months), Defendant Mr. Beck was presented with client non-solicitation covenant and employee non-solicitation covenant, each having a duration of only 12 months, when 18 months (now used by TECH USA) would have been more appropriate.  As explained above, twelve months of "cooling off" by locking out a former employee from TECH USA customers, over which s/he had management/oversight or other contact while a TECH USA employee, affords Plaintiff a reasonable (but sometimes insufficient) opportunity to reassign Customer accounts and/or make adjustments within Plaintiff's sales management structure without interference from the former employee.  On the other hand, TECH USA's reasonable post-term restrictions do not unduly burden a former employee in her/his job search or pursuit of new career opportunities.  Particularly in Mr. Beck's case, he is only restricted as to TECH USA customers, employees and Confidential Information/Trade Secrets – he does not even have a

post-term non-competition covenant of general applicability that would prohibit him from re-entering the Staffing Industry.

27.     In Agreement, Section 11(b), Defendant Mr. Beck acknowledged and agreed that any breach by him of (i) any of the restriction(s)/covenant(s) contained in Section 10(a), 10(b), and/or 10(c) and/or (ii) any of his obligation(s) regarding Confidential Information contained in Agreement Section 9:

> will cause Employer [TECH USA] immediate irreparable harm, entitling Employer to proceed directly to any court of law of competent jurisdiction (notwithstanding any other agreements or clauses between [Mr. Beck and TECH USA] regarding other forms of dispute resolution including, without limitation, face-to-face meeting, mediation, and arbitration) and obtain injunctive relief, including, without limitation, temporary restraining orders, preliminary injunctions and permanent injunctions (collectively "Injunctive Relief"), and that no remedy at law would be adequate to compensate [TECH USA] in any such event.

(See Exhibit A.)

28.     During October 2012, Plaintiff TECH USA learned of Defendant Mr. Beck's breaches of the terms of the Employment Agreement Sections 9 and 10(b) and other legal violations. This suit followed promptly.

## COUNT I

### Breach of Contract (Post-Term Covenant Not to Solicit Client) – Defendant Mr. Beck

29. Plaintiff TECH USA hereby incorporates paragraphs 1- 28 as if each were fully set forth herein.

30. Plaintiff established contractual and other advantageous business relationships with its clients/customers, including, without limitation, TECH USA's customer that became Beck's Solicited TECH USA Customer.

19

31. Over a period of years, Plaintiff has been particularly effective in developing and growing its customer relationship with numerous TECH USA customers, including but not limited to the one that became Beck's Solicited TECH USA Customer.  Plaintiff TECH USA's relationship with that customer, included, without limitation, contract assignments of TECH USA external employees (contractors or contract employees) to projects of Beck's Solicited TECH USA Customer at various locations.  Among the employees, contractors and/or contract employees that Plaintiff TECH USA assigned over the years to its Customer that became Beck's Solicited TECH USA Customer were engineers and other technical professionals having qualifications and/or background similar to Plaintiff's employee Mr. Yeung and six (6) to nine (9) engineers that Defendant Beck and/or Defendant CSL has recently assigned/staffed to Beck's Solicited TECH USA Customer.

32. Defendant Mr. Beck was well aware of TECH USA's contractual and other advantageous business relationships with those customers, including, without limitation, Beck's Solicited TECH USA Customer.  Among other things, when Defendant Mr. Beck was employed by TECH USA, his primary work location was the Tampa office, and it was the personnel of Plaintiff's TDC Government Solutions division, working out of the Tampa office, who had developed the relationship with Beck's Solicited TECH USA Customer and supported that relationship over the years.

33.  In violation of his covenant in Employment Agreement Section 10(b) Defendant Mr. Beck, through Defendant CSL, did "directly or indirectly, for [Mr. Beck's benefit] or for the benefit (or on behalf of) any person, corporation, partnership, LLC…call on; solicit; [and] or perform services for" Beck's Solicited TECH USA Customer, just a few months after Defendant Mr. Beck's resignation from TECH USA employment.

34. Defendant Mr. Beck and Plaintiff expressly agreed that the provisions of Employment Agreement §§ 9 and 10 "are fair and reasonable and are reasonably required for the protection of the interests of [Plaintiff], its officers, directors and other employees. (*see* Section 11(a)) Moreover, Defendant Mr. Beck expressly acknowledged and agreed that any breach by him of any of such sections, including, without limitation, the covenant on non-solicitation of clients contained in § 10(b) "will cause TECH USA immediate irreparable harm, entitling [TECH USA] to proceed directly to any court of competent jurisdiction…, and obtain injunctive relief and that no remedy at law would be adequate to compensate [TECH USA] in any such event." (*see* 11(b)).

35.   Defendant Mr. Beck's acts (direct and indirect) in violating Employment Agreement Section 10(b) have caused, and, unless enjoined, will continue to cause irreparable harm to Plaintiff TECH USA.  The harm cannot be fully compensated in monetary damages.

WHEREFORE, Plaintiff prays judgment against Defendant Mr. Beck as follows:

(a)   Entry of a Preliminary and Permanent Injunction pursuant to Federal Rule of Civil Procedure 65, and Section 10(b), of his Employment Agreement he signed with Plaintiff, enjoining the Defendant Mr. Beck, his agents, servants, and employees, and all those acting in concert with them, from violating the client non-solicitation provisions of such Agreement.

(b)   Entry of an Order requiring an accounting by Defendant Mr. Beck to TECH USA of his (and Defendant CSL's) sales, revenues, and profits as a result of his aforesaid acts in violation of Employment Agreement Section 10(b), and awarding damages to Plaintiff for his illegal conduct up to the entry of an injunction.

(c)   Entry of a judgment against Defendant Mr. Beck for TECH USA's costs and expenses, including, without limitation, its reasonable attorneys' fees and court costs in

connection with this proceeding pursuant to Section 13 of the Employment Agreement between

Plaintiff and Defendant Mr. Beck.

## COUNT II

### Breach of Contract (Confidential Information) – Defendant Mr. Beck

36.     Plaintiff TECH USA hereby incorporates paragraphs 1-35 as if each were fully set

forth herein.

37.     By virtue of his work for Plaintiff at the Tampa office, Defendant Mr. Beck,

Plaintiff's former President, became familiar with the account of the TECH USA customer that

became Beck's Solicited TECH USA Customer and with Mr. Gallagher, a hiring manager for a

subcontractor through which Plaintiff had placed many personnel over a number of years on

projects of Beck's Solicited TECH USA Customer at various locations.  Everything Mr. Beck

learned about Mr. Gallagher, including, but not limited to, his contact information, his role,

experience, background, relationship with Beck's Solicited TECH USA Customer, Mr.

Gallagher's understanding of Beck's Solicited TECH USA Customer's personnel and price and

preferences, needs/requirements for engineering and other technical personnel, etc. constitutes

"Confidential Information" of Plaintiff as defined in Employment Agreement Section 9.

Moreover, all of such information regarding Mr. Gallagher is a trade secret of TECH USA.  In

reaching out to Mr. Gallagher for his "Contender Solutions, LLC" venture (Defendant Mr.

Beck's yacht is named "Contender"), and hijacking TECH USA's relationship with its customer

that became Beck's Solicited TECH USA Customer (or attempting to carry out such a

hijacking), Mr. Beck was violating Section 9 of his Employment Agreement in that he was

"making use of…Confidential Information developed by [TECH USA] of a special and unique

nature and value to [TECH USA], including, but not limited to, the nature and material terms of business opportunities and proposals available to [TECH USA, TECH USA's] methods, system and research, the names and address of its clients and staffing personnel, prices charged and paid…"

      38.     Furthermore, by his contacts through Defendant CSL and its assigning the TECH USA contract employee Allen Yeung and also six (6) to nine (9) engineers and/or technical personnel that Defendant Beck and/or Defendant CSL has recently provided/staffed to Beck's Solicited TECH USA Customer, Defendant Mr. Beck, Plaintiff's former President,  breached the following provision in Employment Agreement Section 9 on Confidentiality: "*Employee covenants and agrees that Employer shall not at any time…following any termination thereof, directly or indirectly, divulge or disclose for use for any purpose whatsoever…Confidential Information which has been obtained by or disclosed to Employee as a result of Employee's employment with Employer.*"   Defendant Mr. Beck necessarily divulged or disclosed to Defendant CSL at a minimum Confidential Information regarding (i) the customer relationship between TECH USA and the customer that became Beck's Solicited TECH USA Customer, (ii)regarding the contract employee(s) working for TECH USA on assignment to Beck's Solicited TECH USA Customer, and/or (iii) prices charged and paid for the various kinds of engineering and technical personnel provided by Plaintiff, as well as the nature and material terms of business opportunities at that TECH USA Customer.  All of the above disclosures are breaches of the Confidentiality provisions contained in Section 9 of the Employment Agreement. Defendant Mr. Beck's disclosures of Confidential Information, as described above, benefitted Defendant Mr. Beck and his newly formed limited liability company, the Defendant Contender Solutions, LLC.

39.   Defendant Mr. Beck, a "trusted leader," and Plaintiff agreed that the provisions of Employment Agreement §§ 9 and 10 "are fair and reasonable and are reasonably required for the protection of the interests of [Plaintiff], its officers, directors and other employees." (*see* Section 11(a)) Moreover, Defendant Mr. Beck expressly acknowledged and agreed that any breach by him of any of such sections, including, without limitation, any of the Confidentiality provisions contained in § 9 "will cause TECH USA immediate irreparable harm, entitling [TECH USA] to proceed directly to any court of competent jurisdiction…, and obtain injunctive relief and that no remedy at law would be adequate to compensate [TECH USA] in any such event." (*see* 11(b)).

40. Defendant Mr. Beck's disclosures and other acts (direct and indirect) in violating Employment Agreement Section 9 have caused, and, unless enjoined, will continue to cause irreparable harm to Plaintiff TECH USA.  The harm cannot be fully compensated in monetary damages.

WHEREFORE, Plaintiff prays judgment against Defendant Mr. Beck as follows:

(a)      Entry of a Preliminary and Permanent Injunction pursuant to Federal Rule of Civil Procedure 65, and Section 9 (Confidential Information provisions) of his Employment Agreement he signed with Plaintiff, enjoining the Defendant Mr. Beck, his agents, servants, and employees, and all those acting in concert with them, from violating the Confidentiality provisions of such Agreement.

(b)      Entry of an Order requiring an accounting by Defendant Mr. Beck to TECH USA of his (and Defendant CSL's) sales, revenues, and profits as a result of his aforesaid acts in violation of Employment Agreement Section 9, and awarding damages to Plaintiff for his illegal conduct up to the entry of an injunction.

(c)     Entry of a judgment against Defendant Mr. Beck for TECH USA's costs and expenses, including, without limitation, its reasonable attorneys' fees and court costs in connection with this proceeding pursuant to Section 13 of the Employment Agreement between Plaintiff and Defendant Mr. Beck.

## COUNT III

### Statutory Trade Secret Misappropriation – All Defendants

41.     Plaintiff TECH USA hereby incorporates paragraphs 1-40 as if each were fully set forth herein.

42.     As recited in Section 9 of the Employment Agreement, in addition to TECH USA's Confidential Information, Defendant Mr. Beck received from Plaintiff in the course of his TECH USA employment Trade Secrets (as defined in the Maryland Uniform Trade Secrets Act) (the "Act"), Md. Comm. Law Code Ann. §11-1201(e).

43.     As detailed above, these trade secrets were numerous and valuable.

44.     Mr. Beck has misappropriated and is using for his own purposes Trade Secrets of TECH USA.   He has disclosed them to Defendant CSL, which has knowingly misappropriated them.

45.     Defendants Mr. Beck's and CSL's misappropriating TECH USA's Trade Secrets and exploiting them unlawfully have been willful and malicious.

46.     Plaintiff has suffered damage and irreparable harm, and unless such misappropriation is enjoined, will continue to suffer damage and irreparable harm as a result of Defendants Mr. Beck's and CSL's unlawful misappropriation of Plaintiff's Trade Secrets.  The harm cannot be fully recompensed in monetary damages, and is irreparable.

WHEREFORE, Plaintiff prays judgment as follows:

(a)     Entry of a Preliminary and Permanent Injunction under Federal Rule of Civil Procedure 65 against Defendants Mr. Beck, CSL and their agents, servants and/or employees, and all those acting in concert with any of them, enjoining them pursuant to § 1202 of the Act from further misappropriation, use, and/or disclosure of TECH USA's Trade Secrets for their own benefit and from otherwise violating the Act.

(b)     Entry of a judgment jointly and severally against all of the Defendants pursuant to § 1203 of the Act for damages for Defendants' violations of the Act up to the date of an injunction and for attorney fees under § 1203.

## COUNT IV

### Tortious Interference with the Contract between Defendant Mr. Beck and Plaintiff TECH USA – Defendant Contender Solutions, LLC

47.     Plaintiff hereby incorporates paragraphs 1-46 as if each were fully set forth herein.

48.     Plaintiff established contractual and other advantageous business relationships with its key management employees including, without limitation, with Defendant Mr. Beck.

49.     Defendant CSL knew of Plaintiff's contractual and other advantageous business relationships with its key management employees including, without limitation, with Defendant Mr. Beck.

50.     Despite knowledge of Plaintiff's contractual and other advantageous business relationships with its key management employees (including, without limitation, Defendant Mr. Beck).  Defendant CSL  intentionally, improperly, tortiously and maliciously for its benefit interfered with Plaintiff's contractual relations with Defendant Mr. Beck by effectively soliciting and encouraging Mr. Beck to breach his contractual and legal obligations to Plaintiff including, without limitation, Defendant Mr. Beck's post-term client non-solicitation obligation in

Employment Agreement 10(b) and his obligation in Employment Agreement Section 9 to preserve the confidentiality of TECH USA's Confidential Information.

51.     Plaintiff has suffered damage and will continue to suffer damage as a result of Defendant CSL's tortious interference.   The harm cannot be fully recompensed in monetary damage, and is irreparable.

WHEREFORE, Plaintiff prays judgment against Defendants CSL as follows:

(a)     Entry of a Preliminary and Permanent Injunction under Federal Rule of Civil Procedure 65 against Defendant CSL and its agents, servants and/or employees, and those acting in concert with them, enjoining them from future tortious interference.

(b)     Entry of an Order requiring an accounting by against Defendant CSL to TECH USA of its sales, revenues, and profits as a result of its aforesaid acts of tortious interference, awarding damages to Plaintiff for Defendant CSL's illegal conduct up to the date of an injunction.

Dated: November 16, 2012

Allan P. Hillman
Kern & Hillman, LLC
2911 Dixwell Avenue, Suite 203
Hamden, CT 06518-3915
(203) 782-9076
allan@franchiselawsource.com
U.S. District Court No. 00119

Grover C. Outland III
TECH USA, LLC
8334 Veterans Highway, Second Floor
Millersville, MD 21108
(410) 923-4059

outland@techusa.net
U.S. District Court No. 24064

**Attorneys for Plaintiff**